RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0255P (6th Cir.)
File Name:  00a0255p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

SUSAN L. HOSKINS,
        *Plaintiff-Appellant,*

        *v.*

OAKLAND COUNTY SHERIFF'S
DEPARTMENT, and THE
COUNTY OF OAKLAND,
        *Defendants-Appellees.*

No. 99-1491

———————

Appeal from the United States District Court
for the Eastern District of Michigan at Flint.
No. 98-40213—Paul V. Gadola, District Judge.

Argued:  June 15, 2000

Decided and Filed:  July 31, 2000

Before:  JONES, MOORE, and GILMAN, Circuit Judges.

———————

## COUNSEL

**ARGUED:**  Joseph C. Bird, STARK, REAGAN &
FINNERTY, Troy, Michigan, for Appellant.  Rick J.
Patterson, POTTER, CARNIAK, ANDERSON &
DeAGOSTINO, Auburn Hills, Michigan, for Appellees.
**ON BRIEF:**  Joseph C. Bird, Jeffrey J. Fleury, STARK,

1

REAGAN & FINNERTY, Troy, Michigan, for Appellant. Rick J. Patterson, POTTER, CARNIAK, ANDERSON & DeAGOSTINO, Auburn Hills, Michigan, for Appellees.

––––––––––––––––

**OPINION**

––––––––––––––––

KAREN NELSON MOORE, Circuit Judge.  Plaintiff-appellant Susan L. Hoskins, who was a deputy with the Oakland County Sheriff's Department, was fired after she suffered an injury that rendered her unable to restrain inmates. She brought suit against the Sheriff's Department and the County of Oakland (hereinafter referred to collectively as "defendants"), asserting claims under both the Americans with Disabilities Act and Title VII.  The district court granted summary judgment to the defendants, and for the following reasons we **AFFIRM**.

**I.  BACKGROUND**

Susan Hoskins worked for the Oakland County Sheriff's Department ("OCSD") from 1979 until her termination in 1997.  She began her career as a dispatcher at the Oakland County Jail.  In 1982, Hoskins successfully tested for the position of deputy sheriff, level one ("deputy one"). Hoskins's original placement as a deputy one was in the women's division at the Oakland County Jail.  In 1987, Hoskins was assigned to Oakland County Circuit Court detention, where her duties included transporting prisoners from the jail to detention.  From 1993 until her termination in 1997, Hoskins was assigned to the Novi District Court, a position that also involved the transportation of inmates. Hoskins's positions at both the circuit and district courts involved daily contact with prisoners and the potential for physical confrontation.

On August 25, 1996, Hoskins suffered severe non-work-related injuries when a horse fell on her.  Hoskins's primary care physician, Dr. E. Patrick Mitchell, indicated that

Hoskins's injuries included a "non-displaced fracture of the inferior and superior pubic ramus on the left and fractured bilateral clavicles." Joint Appendix ("J.A.") at 122 (Mitchell Letter). As a result of these multiple injuries, Hoskins was hospitalized for two and a half weeks and underwent a recuperation period of a year and a half. Hoskins was treated by two different doctors and obtained letters restricting her activity from both. On July 11, 1997, Dr. William Bria, a pulmonary specialist, wrote a letter stating that Hoskins "is able to return to work, however, she should not be lifting or engaging in any activity that would jar her chest, such as shooting a shotgun or getting into a situation in which she could get hit in the chest." J.A. at 121 (Bria Letter). On July 18, Dr. Mitchell attached a disability certificate to Dr. Bria's letter; the certificate indicated that Hoskins was restricted to light work duties that did not impact her anterior chest or shoulders. Dr. Mitchell also wrote a letter on September 29, 1997 that stated:

> [Hoskins] has restrictions of no lifting, pushing or pulling over 20 pounds, no use of shotgun and no restraining of inmates. She still experiences pain and decreased range of motion. She has severe limitation of her functional capacity and needs a sedentary position. Her motivation and rehabilitation potential is excellent. Her prognosis is guarded.
>
> I do not believe that Susan will ever be able to resume full duty as a Deputy with Oakland County Sheriff's Department. She will probably need permanent restrictions of certain activities which would be considered duties of a Deputy Sheriff.

J.A. at 122 (Mitchell Letter).

After receiving Dr. Bria's July 11 letter with the attached disability certificate, Hoskins took them to Carol VanLeuven, an employee records specialist for the County. Although Hoskins expressed a desire to return to work, VanLeuven told her that she could not because no light duty positions were available. The County then conducted a pre-termination

hearing on November 7, 1997. At the hearing, Major Thomas Quisenberry, the Chief of Staff at OCSD, indicated that Hoskins was being terminated because her work restrictions were incompatible with the duties of a deputy one. Hoskins was asked if she was interested in a job as a dispatcher or a booking clerk — jobs that did not require inmate contact but that also involved a significant pay cut — and she replied that she was not interested. Hoskins stated, "Basically I'd rather just be a Deputy." J.A. at 130. After the hearing, the hearing officer issued a decision affirming Hoskins's termination.

On June 16, 1998, Hoskins filed suit in the United States District Court for the Eastern District of Michigan, asserting claims under both the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* On March 26, 1999, the district court granted the defendants' motion for summary judgment. The district court dismissed Hoskins's ADA claim on the basis that she failed to establish that she had a disability within the meaning of the Act. Alternatively, the district court reasoned that Hoskins had not satisfied the second element of her prima facie case because she had not established that she was qualified to perform the essential functions of the job with reasonable accommodation. Hoskins also brought a disparate treatment claim under Title VII, alleging that OCSD had provided male deputies the opportunity to work in light duty deputy positions following disabling injuries. The district court dismissed this claim on the basis that Hoskins had not established a prima facie case of gender discrimination. Hoskins timely appealed the district court's judgment.

## II. ANALYSIS

We review de novo a district court's grant of summary judgment. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998). Summary judgment is proper only when there is no dispute as to a material question of fact and one party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c). Viewing all facts and

were comparable to her in all relevant aspects, her Title VII claim was properly dismissed.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment.

by the defendants for her termination, the district court should have answered the question of whether Hoskins was qualified for the position of deputy one without consideration of this reason. When properly analyzed, it is clear that Hoskins has established, by a preponderance of the evidence, that she is qualified for the position.

Hoskins has not, however, met her burden of establishing that she was treated differently from similarly situated male deputies. A plaintiff "need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered 'similarly-situated'"; however, the plaintiff and the comparable must be similar in all *relevant* aspects. *Ercegovich*, 154 F.3d at 352. We conclude that Hoskins has not made this showing.

In her brief, Hoskins argues that eleven male deputies "all suffered disabling injuries and, at least for some period of time, were unable to perform the essential functions of a deputy," and she claims that these men were all accommodated by OCSD. Appellant's Br. at 35-36. In her deposition, however, Hoskins was not able to identify any deputy who was permitted to come back to work with doctor's restrictions. In his deposition, Major Quisenberry identified five male deputies who were accommodated temporarily while having restrictions from their doctors. However, these men were not, like Hoskins, *permanently* restricted from performing an essential function of the deputy one position. Although Hoskins need not prove that these five men were identical to her in every respect, the expected duration of disability is relevant for purposes of her claim. Furthermore, none of the men identified by Hoskins had a restriction similar to hers, which precluded her from performing an essential function of the deputy one position. Three of the men were temporarily taken off road patrol duty and one was restricted from carrying a handgun, but Major Quisenberry testified that some deputy positions do not require driving and that most do not require the carrying of a handgun. Because Hoskins has not shown that these men

inferences drawn therefrom in the light most favorable to the nonmovant, we must determine whether the evidence presented is such that a reasonable jury could find for that party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A. ADA Claim

The ADA prohibits covered employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the ADA, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). A "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

In the instant case, it is undisputed that Hoskins was fired because of her inability to restrain inmates. "[W]hen an employer admits that it relied upon a disability in making an adverse employment decision, an employee may establish a *prima facie* case of employment discrimination under the ADA by showing that he or she (1) has a disability, and (2) is 'otherwise qualified' for the position despite the disability either '(a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation.'" *Hamlin v. Charter Township of Flint*, 165 F.3d 426, 429 (6th Cir. 1999) (quoting *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)). After the employee has made

this showing, "[t]he employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Monette*, 90 F.3d at 1186.

### 1.   Whether Hoskins is Disabled Within the Meaning of the ADA

The district court determined, based upon Hoskins's own testimony, that she did not establish that she was disabled within the meaning of the ADA. The statute defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). It is uncontested that Hoskins has a physical impairment, as her condition affects both her musculoskeletal and respiratory systems. *See* 29 C.F.R. § 1630.2(h)(1) (1999).[1] Additionally, Hoskins's disability affects several of her major life activities, including breathing, moving, performing manual tasks such as doing laundry, and working. *See* 29 C.F.R. § 1630.2(i) (defining major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working").

The question is whether Hoskins's disability "substantially limits" any of these major life activities. The regulations provide that substantially limits means "(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to

_____

[1] As the Supreme Court explained in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), although no agency has been delegated authority to issue regulations implementing the generally applicable provisions of the ADA — including the term "disability" — the EEOC has nonetheless issued regulations providing guidance regarding the proper interpretation of that term. *See id.* at 479. Because neither party to the instant appeal has challenged the validity of these EEOC regulations, we assume their validity. *See id.* at 480.

establishes her prima facie case, then an inference of discrimination arises. At that point the burden of production shifts to the employer, who must set forth a legitimate, nondiscriminatory reason for the plaintiff's discharge. *See id.* at 729. The plaintiff then has the opportunity to demonstrate that the employer's proffered reason for taking the adverse action was pretextual. *See id.* To so demonstrate, the plaintiff must prove "that the [employer's] asserted reasons have no basis in fact, that the reasons did not in fact motivate the discharge, or, if they were factors in the [employer's] decision, that they were jointly insufficient to motivate the discharge." *Id.* (quotation omitted) (alterations in original).

The district court found that Hoskins failed to make out a prima facie case of employment discrimination. It explained that Hoskins's inability to perform the essential function of restraining inmates rendered her unqualified for the position of deputy one. Assuming, *arguendo*, that Hoskins could establish a prima facie case, the district court concluded that Hoskins failed to present sufficient evidence of pretext to rebut the defendants' legitimate nondiscriminatory reason for discharging her.

The district court in the instant case fundamentally misapplied the *McDonnell Douglas* test. The court concluded that Hoskins was not qualified because of her inability to perform an essential function of the job. However, Hoskins's claim is that although the defendants fired her because of her disability, they accommodated males with similar restrictions. The district court's analysis essentially precluded Hoskins from being able to challenge the policy she alleges to be discriminatory. We addressed a similar situation in the recent case of *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651 (6th Cir. 2000), and we instructed that "when assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Id.* at 660-61. Because Hoskins's inability to restrain inmates is the reason proffered

her proposed accommodation is a reasonable one. *Cf. Hill v. Harper*, 6 F. Supp. 2d 540, 544 (E.D. Va. 1998) (holding that former deputy sheriff's proposed accommodation that he be placed in the control room on a permanent basis was unreasonable, "because this accommodation effectively eliminated the 'essential function' of being able to rotate through the various duty posts"); *McDonald v. Kansas Dep't of Corrections*, 880 F. Supp. 1416, 1422-23 (D. Kan. 1995) (finding that a state prison was not obligated to allow an obese correctional officer with a heart condition to work at only certain of the posts within the prison, as such a requested accommodation was unreasonable).

Therefore, because Hoskins has failed to create a genuine issue of material fact as to whether restraining inmates is an essential function or as to whether she could perform the essential functions of the deputy one position with reasonable accommodation, we affirm the district court's grant of summary judgment to the defendants.

## B. Title VII Claim

Hoskins also asserts a gender discrimination claim based on these same facts. She alleges that the defendants accommodated several similarly situated male deputies by allowing them to work light-duty jobs when disabled by injury.

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court set forth the framework for analyzing cases alleging workplace discrimination based on indirect evidence. Under the *McDonnell Douglas* burden-shifting framework, the plaintiff bears the burden of establishing, by a preponderance of the evidence, a prima facie case by demonstrating: "(1) membership in the protected class; (2) that she suffered an adverse action; (3) that she was qualified for the position; and (4) that she was replaced by someone outside the protected class or was treated differently from similarly situated members of the unprotected class." *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 728-29 (6th Cir. 1999). If the plaintiff

the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). The regulations further provide a list of factors to be considered in determining whether an individual meets this definition: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

The district court relied on Hoskins's own testimony to conclude that her impairment does not substantially limit any major life activities. Hoskins testified: "I have to be careful the way I move at times. It hurts to cough, sneeze, if I breathe the wrong way. But I learned just to kind of ignore it or — I just be careful with the way I do things." J.A. at 203 (Hoskins Dep.). Hoskins also testified that in her daily activities such as doing laundry, she sometimes feels pain that causes her to stop doing that activity. However, Hoskins indicated that she does not let her impairments stop her from doing anything and that she "attempt[s] to do everything." J.A. at 203 (Hoskins Dep.). The district court quoted the following passage from Hoskins's testimony, finding it "especially significant":

Q:  Would it be a fair statement that you have learned some behavior that allows you to avoid discomfort [in the chest area] <u>by avoiding certain activities</u>?

A:  <u>No, not avoiding certain activities</u>.

Q:  Just the way you do them?

A:  Yes.  A little bit more careful.

J.A. at 32 (D. Ct. Op.).

We believe that the district court employed an exceedingly narrow interpretation of "substantially limits." Of course, in

determining whether a disability substantially limits a major life activity, the Supreme Court has instructed that courts are to consider natural adoptive measures that mitigate the disability. *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565-66 (1999). However, under the reasoning of the district court, an individual would be disabled within the meaning of the ADA only if she can show that she has avoided certain major life activities as a result of her impairment. This is not the law; as the applicable regulations instruct, an individual is substantially limited if she is able to perform a major life activity but is "[s]ignificantly restricted as to the condition, manner or duration" under which she can perform that activity. 29 C.F.R. § 1630.2(j)(1)(ii). We conclude that Hoskins has raised a genuine issue of material fact regarding whether her impairment substantially limits the major life activities of breathing, moving, and performing manual tasks such as doing laundry.[2] According to Hoskins's testimony, both the manner and duration under which she can perform these major life activities are significantly restricted. She testified that after her accident, she must now be careful about the way that she moves. Although she "attempt[s] to do everything," she must sometimes cease for a time performing daily activities because of the pain. J.A. at 203 (Hoskins Dep.). The duration of Hoskins's impairment is likely permanent. In support of their position, the defendants cite *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876 (6th Cir. 1996), a case in which this court concluded, based upon the plaintiff's own admissions, that her multiple sclerosis did not substantially limit any of her major life activities. However, we find *Kocsis* inapposite because in that case, unlike in the instant case, the plaintiff "testified in her deposition that none of her impairments — arthritis, MS, or any combination of health problems — limited her activity *in any way*." *Id.* at 884 (emphasis added).

---

[2]Because of this conclusion, we need not address whether Hoskins is also substantially limited in the major life activity of working. *See Sutton*, 527 U.S. at 492 (citing 29 C.F.R. pt. 1630, App. § 1630.2(j) for the proposition that working should be considered only if an individual is not substantially limited with respect to any other major life activity).

temporarily restricted from performing their usual positions. However, once an injured employee's restrictions became permanent, the employee could not remain in the interim light-duty job but was required either to transfer to another position where he could perform the required duties or to go on "medical layoff." *Id.* at 689. The plaintiffs challenged this policy, arguing that Excel should not remove the permanently restricted employees from the light-duty jobs that were designated by Excel as temporary rehabilitation-period jobs. The Seventh Circuit first noted that it had approved of an employer's offer of light-duty assignments as a reasonable accommodation for injured workers. *See id.* at 696. However, relying on its prior decision in *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667 (7th Cir. 1998), the court held that the ADA does not compel an employer to convert temporary positions it has set aside into permanent positions for its disabled employees. As the *Dalton* court had explained, "[t]o hold otherwise would be to require [the employer] to create new full-time positions to accommodate its disabled employees, a course of action not required under the ADA." *Id.* at 680.

Although these Seventh Circuit cases are not directly on point, as they involved temporary light-duty positions for recuperating employees rather than a relief position,[4] we nevertheless find them instructive. Like the plaintiffs in *Hendricks-Robinson* and *Dalton*, Hoskins suggests that she be assigned to a rotating-type job on a permanent basis. We agree that Hoskins's request would essentially require the creation of a new position rather than reassignment to an otherwise existing vacant one. As we have made clear, an employer's duty to reassign an otherwise qualified disabled employee does not require that the employer create a new job in order to do so. *See Cassidy*, 138 F.3d at 634. We therefore conclude that Hoskins has not met her burden of showing that

---

[4]The *Hendricks-Robinson* court explained that "it would frustrate the ADA for permanently impaired employees to fill temporary light-duty assignments when those jobs have been set aside specifically for recuperating employees." *Hendricks-Robinson*, 154 F.3d at 697.

substation position was not available when OCSD learned of Hoskins's disabling injury nor was its availability anticipated in the near future, we conclude that assignment to that position was not a reasonable accommodation.

Hoskins's strongest argument is that the defendants should have reassigned her permanently to a position in one of the control booths within the jail facility. The control booth operators, who sit in a locked booth, are primarily responsible for operating the control panel so as to permit officers to enter and leave cell blocks. Major Quisenberry explained that the control booth positions are assigned on a rotating basis to the deputies. He stated: "The normal assignment is to allow [deputies] to work the [cell] blocks and then after a day of a block or a particular[ly] hard block, that you give a deputy a chance to have a break somewhat. The booth is considered probably an easier job in the main jail. So in fairness to everybody, it has traditionally been that that [sic] booth job would be rotated around so that everybody had a chance to have their break." J.A. at 134 (Quisenberry Dep.). The defendants do not dispute that the control booth position involves no inmate contact and that Hoskins would therefore be qualified for it; instead, they argue that assigning Hoskins to this temporary position on a permanent basis is not a reasonable accommodation. We have not before had occasion to address the issue of whether a reasonable accommodation would include turning a rotating or relief position into a permanent position. On the facts of this case, we conclude that such an accommodation is not a reasonable one.

In support of their position that the ADA imposes no duty on an employer to convert a temporary relief position into a new full-time position, the defendants cite the Seventh Circuit case of *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685 (7th Cir. 1998). In *Hendricks-Robinson*, former employees of an Excel meatpacking plant brought a class action alleging that Excel's medical layoff policy violated the ADA because it failed to provide reasonable accommodation to its permanently disabled employees. Excel set aside a number of the least physically demanding jobs for employees who were

**2.  Whether Hoskins is "Otherwise Qualified" for the Position of Deputy One**

**a.  Essential Function**

Hoskins contends that physical restraint of inmates is not an essential function of the deputy one position. If physical restraint of inmates is not an essential job function, then Hoskins meets the definition of a qualified individual with a disability because the parties agree that she is fully able to perform all functions of the deputy one position save this one. Because Hoskins challenged this job criterion as unessential, the district court properly placed the burden on the defendants to demonstrate that this criterion is in fact a fundamental job duty.

"The term *essential functions* means the fundamental job duties of the employment position the individual with a disability holds or desires," but it does not include only marginal functions. 29 C.F.R. § 1630.2(n)(1). In determining whether a particular function is essential, the regulations instruct courts to consider the following list of factors, which is illustrative rather than exhaustive:

(i)   The employer's judgment as to which functions are essential;
(ii)  Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii) The amount of time spent on the job performing the function;
(iv)  The consequences of not requiring the incumbent to perform the function;
(v)   The terms of a collective bargaining agreement;
(vi)  The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3). The inquiry into whether a function is essential is highly fact specific. *See Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (6th Cir. 1998); *Hall v.*

*United States Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988) ("Such a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved.").

In support of their position that physically restraining inmates is a fundamental duty of a deputy one, the defendants submitted a written job description as well as the testimony of Major Quisenberry. The general summary of the job of deputy one reads, in pertinent part, as follows:

> Under general supervision and as a Deputy Sheriff appointed by the Oakland County Sheriff, performs duties within the corrections or on occasion road patrol areas. As a Deputy I in the corrections area, performs routine security and custody activities. Assists in maintaining and enforcing procedures and regulations to ensure security is maintained at the jail and satellite facilities. Distributes meals, bedding and supplies to inmates. Screens visitors, issues passes and ensures visitation regulations are maintained. Transports inmates to authorized facilities, ensuring that security procedures are followed. Physically restrains individuals as necessary. May, at times, perform certain Deputy II functions in limited instances.

J.A. at 140. The written description lists, as among the typical duties for a deputy one within the corrections area: driving the transportation vehicle and supervising the conduct of inmates during transportation to authorized facilities; supervising inmates being held at the courthouse and awaiting court appearances; guarding inmates during courtroom appearances to ensure that security is maintained; supervising the activities of inmates assigned to all jail facilities; searching inmates; and ensuring that security is maintained at jail facilities. J.A. at 140-41. The defendants also presented the testimony of Major Quisenberry, the Chief of Staff at OCSD, who stated that he believed physical restraint of

circumstances could promote employee loyalty and teamwork. However, employers are not required to do so under the ADA."); *see also* 29 C.F.R. pt. 1630, App. § 1630(o) ("An employer or other covered entity is not required to reallocate essential functions.").

Hoskins next argues that the defendants failed to accommodate her by reassigning her to a different position. Hoskins identifies several positions that are equivalent to her old position, but that do not require the restraint of inmates. The first position identified by Hoskins is the intake position at the new commerce substation, which requires answering phones and taking walk-in reports from the general public. It is well established, however, that an employer is not obligated to create a position not then in existence. *See, e.g., Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998). The commerce substation position did not exist during the time in which the defendants attempted to find a suitable assignment for Hoskins (fall of 1997), or at the time she was fired on November 7, 1997. Indeed, Hoskins was deposed on December 11, 1998, and at that time she stated that the commerce substation position had just been created and was to start on January 1, 1999. Although an employer may be required to reassign an individual to a position that is currently unavailable but that will become vacant within a reasonable amount of time, in the instant case the new position was created well over a year after OCSD became aware of Hoskins's disability. *See* 29 C.F.R. pt. 1630, App. § 1630.2(o) ("As an example, suppose there is no vacant position available at the time that an individual with a disability requests reassignment as a reasonable accommodation. The employer, however, knows that an equivalent position for which the individual is qualified, will become vacant next week. Under these circumstances, the employer should reassign the individual to the position when it becomes available."); *Monette*, 90 F.3d at 1187 ("If, perhaps, an employer knows that a position for which the disabled applicant is qualified will become vacant in a short period of time, the employer may be required to offer the position to the employee."). Because the commerce

"When the employee seeks a reasonable accommodation, she must establish that a 'reasonable' accommodation is possible, and bears a traditional burden of proof that she is qualified for the position with such reasonable accommodation. If the plaintiff establishes that a reasonable accommodation is possible, the employer bears the burden of proving that such reasonable accommodation would impose an undue hardship." *Monette*, 90 F.3d at 1186 n.12.

Hoskins first contends that she can perform the function of restraining inmates with the assistance of others. She explains that it is OCSD's policy that deputies call for assistance when attempting to restrain an inmate, and she reasons that "[i]f it is department policy that multiple deputies are to be used when attempting to physically restrain an inmate, then it is not unreasonable for Defendants to provide this same accommodation to Plaintiff on a more permanent basis." Appellant's Br. at 29. However, the ADA does not require employers to accommodate individuals by shifting an essential job function onto others. *See, e.g., Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999) ("The only possible accommodation [the plaintiff] identifies is allowing co-workers to perform as much as 20% of the essential automotive mechanic duties for Bratten when he needs such assistance. . . . Continuing the practice of 'assisting' Bratten in tasks on an *ad hoc* basis may be sound labor relations policy for defendants, as we can imagine that such

---

disability." Instead, if Hoskins can demonstrate that an equivalent position was open for which she was otherwise qualified, then she will prevail on her claim. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999) ("Reassignment does not constitute reasonable accommodation . . . where a position comparable to the employee's former placement is available, but the employee instead is assigned to a position that would involve a significant diminution in salary, benefits, seniority or other advantages that she possessed in her former job. Accordingly, to prevail on an ADA claim where the employer has offered reassignment as a reasonable accommodation, the employee must offer evidence showing both that the position offered was inferior to her former job and that a comparable position, for which the employee was qualified, was open.").

---

inmates to be a fundamental part of the job of deputy one. Major Quisenberry explained:

> The deputy one is the deputy that's the entry level position, and it's the one person who has the closest individual contact with prisoners or inmates in the Oakland County Jail. They're the first line-of-defense, I suppose, with the prisoner, whether it be from the time they get up in the morning with their feedings until they go to bed at night. It's generally the deputy ones who have the day-to-day contact with prisoners. And the opportunity and at times the necessity that they have to have physical contact with those inmates I think falls within this physically restrain individuals as necessary line that we're referring to.

J.A. at 139.

In response to this showing, Hoskins first points out that deputy ones rarely, if ever, are required physically to restrain inmates, thus suggesting that the function is not essential. Hoskins presented testimony regarding her own work experience; although she acknowledged that her job involved the potential for physical confrontation with inmates on a daily basis, Hoskins testified that in her entire career as a deputy one she had only one physical altercation with an inmate. Hoskins also pointed to Major Quisenberry's testimony that most of the time verbal orders to prisoners will suffice to maintain security, so that physical confrontation is rare. Second, Hoskins argues that the fact that no physical testing is required for the position of deputy one indicates that physical restraint of inmates is unessential.

We conclude that the evidence presented by Hoskins is not sufficient to create a material issue of fact on this issue. The summary judgment evidence taken as a whole reveals that the deputy one position exists to supervise inmates and to maintain security. Although a deputy one may be required physically to restrain inmates only infrequently, the potential for physical confrontation with inmates exists on a daily basis, and the consequence of failing to require a deputy to perform

this function when the occasion arises could be a serious threat to security.  *See* 29 C.F.R. pt. 1630, App. § 1630.2(n) ("The consequences of failing to require the employee to perform the function may be another indicator of whether a particular function is essential.  For example, although a firefighter may not regularly have to carry an unconscious adult out of a burning building, the consequence of failing to require the firefighter to be able to perform this function would be serious."); *Brickers*, 145 F.3d at 849-50 ("Although, as Brickers has argued, it may be true that a[] [bus] attendant [on special education buses transporting handicapped students] seldom, if ever, must perform any lifting, the ability to lift would be crucial in an emergency situation . . . .").

Hoskins next cites *Hamlin v. Charter Township of Flint*, 165 F.3d 426 (6th Cir. 1999), for the proposition that the mere potential that a deputy would have to restrain an inmate is insufficient to render that job function essential.  In *Hamlin*, the plaintiff, who was an assistant fire chief, suffered a heart attack and was authorized to return to work on condition that he not engage in strenuous physical activities such as front-line firefighting.  After being fired because of his inability to engage in front-line firefighting, the plaintiff brought suit and challenged this particular requirement as unessential.  The plaintiff presented proof "that the key functions of his job [as assistant fire chief] were supervisory and administrative in nature, as distinguished from those of a firefighter, which include 24-hour shifts, being the primary responder to emergencies, and engaging in strenuous front-line fire suppression, search, and rescue." *Id.* at 429.  If the assistant fire chief were ever needed at the scene of an emergency, the plaintiff testified that his role would be supervisory rather than active engagement in firefighting.  We affirmed a jury verdict in favor of the plaintiff, reasoning that the issue of whether front-line firefighting was an essential function was properly submitted to the jury.  The situation in *Hamlin* is entirely different than the situation in the instant case, for the plaintiff in *Hamlin* produced overwhelming evidence that firefighting was not an essential function of his supervisory position.  The quote on which Hoskins relies, which indicates

that an employer may not deny an employment opportunity to a disabled individual based on a slightly increased risk, is taken from the portion of the opinion dealing with the defendant's claim that the plaintiff was not qualified because he posed a "direct threat" to the safety of himself and others, an entirely different inquiry than the one before us today.  *See id.* at 432.

### b. Reasonable Accommodation

Assuming that restraining inmates is an essential function of the deputy one position, Hoskins next proposes several accommodations that she contends would permit her to perform the essential functions.  Reasonable accommodation may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).[3]  We have explained:

---

[3] The regulations provide that although an employee is not required to accept an offered accommodation, if an individual rejects a "reasonable accommodation . . . that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered a qualified individual with a disability." 29 C.F.R. § 1630.9(d); *see Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996).  Furthermore, "an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided." *Hankins*, 84 F.3d at 800-01.  In the instant case, the defendants offered Hoskins reassignment to two different positions.  However, unlike in *Hankins*, the positions offered in the instant case were not comparable to a deputy one position, as both involved a pay cut.  The regulations instruct that employers "should reassign the individual to an equivalent position, in terms of pay, status, etc., if the individual is qualified, and if the position is vacant within a reasonable amount of time," and should only reassign an individual to a lower graded position if the individual cannot be accommodated in an equivalent position.  29 C.F.R. pt. 1630, App. § 1630.2(o).  Therefore, we hold that Hoskins's refusal to accept one of the lower graded positions does not automatically preclude her from being considered a "qualified individual with a